IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:19-CV-66-FL

| | |
|---|---|
| WILLIAM F. (BILLY) BADALATO, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) ORDER |
| WISH TO GIVE PRODUCTION, LLC; | ) |
| 16:14 ENTERTAINMENT INC.; | ) |
| INTERNATIONAL ALLIANCE OF | ) |
| THEATRICAL STAGE EMPLOYEES, | ) |
| MOVING PICTURE TECHNICIANS, | ) |
| ARTISTS AND ALLIED CRAFTS OF | ) |
| THE UNITED STATES ITS | ) |
| TERRITORIES AND CANADA, | ) |
| AFL-CIO, CLC; IATSE LOCAL 491; | ) |
| SCOTT D. HARBINSON; VAL T. HILL; | ) |
| YALE BADIK; STEVEN P. WEGNER, | ) |
| | ) |
| Defendants. | ) |

This matter is before the court on plaintiff's motion to remand (DE 28) and motion to dismiss counterclaims for failure to state a claim (DE 43). Also before the court are a motion to transfer venue by defendants 16:14 Entertainment Inc. ("16:14"), Yale Badik ("Badik"), Val T. Hill ("Hill"), Steven P. Wegner ("Wegner") and Wish to Give Production, LLC ("WTGP") (DE 32); and a motion to dismiss for lack of jurisdiction and failure to state a claim by defendants Scott D. Harbinson, IATSE Local 491, International Alliance of Theatrical Stage Employees, Moving Picture Technicians, Artists and Allied Crafts of the United States Its Territories and Canada, AFL-CIO, CLC ("IATSE") (collectively, "union defendants") (DE 37). The issues raised have been fully briefed and are ripe for ruling. For the following reasons, plaintiff's motion to remand is granted

and the court leaves the remaining motions for further proceedings in state court.

## STATEMENT OF THE CASE

Plaintiff, a resident of Los Angeles, California, commenced this action in New Hanover County Superior Court by complaint filed February 6, 2019, asserting claims against defendants arising out of an alleged employment contract between plaintiff and defendant WTGP for work performed as "Executive Producer" on a film called "Hope's Wish" to be filmed on location in Charlotte, North Carolina. (Compl. ¶¶ 13, 29). Plaintiff asserts state law claims for unpaid wages, tortious interference with contract, civil conspiracy, defamation, actual fraud, wrongful termination, and unfair and deceptive trade practices.

Plaintiff's claims are based on the assertion that the union defendants interfered with the alleged employment contract between plaintiff and WTGP, defendant Wegner made defamatory statements, defendants Hill and Badik made false representations, WTGP wrongfully terminated him and failed to pay wages due, and union defendants, Hill, Badik, and WTGP engaged in unfair and deceptive trade practices. Plaintiff seeks compensatory, punitive, and trebled damages.

Defendant WTGP noticed removal on March 29, 2019, asserting federal subject matter jurisdiction on the basis that plaintiff's claims are completely preempted by Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). Defendant WTGP asserts that plaintiff's claims necessitate the interpretation of provisions of a collective bargaining agreement governing plaintiff's work with WTGP.

Plaintiff filed the instant motion to remand on April 23, 2019, relying on his declaration and

excerpts of a "Directors Guild of America ['DGA'] Basic Agreement of 2014." (DE 29-2 at 2).[1]

Defendants Hill, Badik, Wegner, 16:14 and WTGP, filed an answer and counterclaims, on April 26, 2019, along with the instant motion to transfer venue to the United States District Court for the Central District of California. In support of the motion to transfer, these defendants rely upon declarations of Badik, Hill, and their counsel. That same date, the union defendants filed the instant motion to dismiss, relying upon a declaration of Adrian Healy, associate counsel for IATSE.

Defendant WTGP responded in opposition to plaintiff's motion to remand, relying on a declaration of Alan M. Brunswick ("Brunswick"), counsel for defendant WTGP, with reference to correspondence between him and the Directors Guild of America, Inc ("DGA"). Defendant WTGP also relies upon a declaration of defendant Badik, referencing the following documents: 1) a "Letter of Adherence" executed by DGA and Badik for WTGP; 2) documents pertaining to plaintiff's work for WTGP; and 3) excerpts of the DGA "Basic Agreement of 2014."

Plaintiff filed the instant motion to dismiss counterclaims of the union defendants, as well as a response in opposition to the union defendants' motion to dismiss, on May 17, 2019. That same date, plaintiff responded in opposition to the motion to transfer venue, relying upon his declaration. Plaintiff thereafter filed a reply in support of his motion to remand, relying upon his additional declaration.

Defendants WTGP, 16:14, Badik, Hill, and Wegner, replied in support of their motion to transfer, relying upon a letter from counsel for plaintiff listing witnesses. That same date, the union defendants replied in support of their motion to dismiss. Defendants WTGP, 16:14, Badik, Hill, and

---

[1] Throughout this order, unless otherwise specified, page numbers in citations to documents in the record are to the page number specified in the court's Electronic Case Filing (ECF) system, and not to the page number, if any, specified on the face of the underlying document.

Wegner, thereafter responded in opposition to plaintiff's motion to dismiss counterclaims relying upon a second declaration of Brunswick, attaching additional excerpts of the DGA "Basic Agreement of 2014." (DE 52-1). Finally, on June 21, 2019, plaintiff replied in support of his motion to dismiss counterclaims.

## STATEMENT OF FACTS

The facts alleged in the complaint may be summarized as follows.

In April 2017, plaintiff, who had worked previously as a "production manager" and an "assistant to a producer" on prior films, "was approached regarding a potential role as Executive Producer of the film 'Hope's Wish' (the 'Film'), to be filmed in 2018 on location in Charlotte, North Carolina and to star Queen Latifah." (Compl. ¶¶ 12-13). Defendants Hill, Badik, and Wegner "were three of the Film's producers." (Id. ¶ 13). "Throughout the remainder of 2017, [plaintiff] worked in furtherance of the Film, awaiting funding of the Film before joining the venture as an employee." (Id.). "It was understood and agreed that, partially in exchange for his services to the venture in this prefunding stage, [plaintiff] would be named Executive Producer of the Film after funding had been secured and that his compensation as Executive Producer would reflect the value of the services rendered in the pre-funding stage." (Id.).

On January 22, 2018, plaintiff attended a meeting with defendants Hill, Badik, and Wegner. During the meeting, defendants Hill and Badik "stated that the Film had secured full funding, in an amount in excess of $20 million, and that the funds were fully in place and available for the Film." (Id. ¶ 14). Defendants Hill and Badik further "stated that, because they had secured full funding for the Film, they were 'green-lighting' the Film." (Id.). According to plaintiff, "[i]n the entertainment industry, 'green-lighting' is a term that refers to a preproduction stage in which offices are opened,

4

stages rented, and crew hired to produce the Film." (Id.). "Green-lighting marks the point at which money on a film can be spent and thus only occurs once there has been a funding commitment." (Id.).

According to plaintiff, in reliance on the representations by defendants Hill and Badik described in the preceding paragraph, plaintiff "agreed to join the venture as an employee, serving as Executive Producer of the Film." (Id. ¶ 15). Plaintiff's "first date of employment was January 22, 2018." Plaintiff "would not have agreed to be an employee of the venture, would not have agreed to serve as Executive Producer of the Film, and would not have elected to forgo other valuable business opportunities had he known that full funding for the Film had not in fact been secured." (Id.). "During his period of employment with the venture, [plaintiff] was employed first by [d]efendant 16:14 and, subsequently, by [defendant WTGP]." (Id. ¶ 16).

"In his role as Executive Producer, [plaintiff] was tasked, in part, with the recruitment and management of the Film's crew." (Id. ¶ 17). "At all times during his service as Executive Producer, [plaintiff] acted upon the direction of the Film's producer." (Id.). "On March 7, 2018, the venture's accountant informed [plaintiff] that the venture did not have funds with which to pay the crew, who were due to be paid." (Id.). On March 8, 2018, and again on March 9, 2018, defendants Hill and Badik "reassured [plaintiff] that 'financing was intact,' that this was a 'banking error,' that this was a temporary situation, and that the Film was still fully funded." (Id.). According to plaintiff, "[i]n reliance on these representations, plaintiff continued as Executive Producer of the Film and, on March 9, 2018, called a meeting of some of the crew and informed them that . . . checks would be available for pick-up as soon as the issues had been resolved." (Id.).

Plaintiff "did not know, and did not learn until later, that the producers had not secured full

5

funding for the film and that the representations made" to plaintiff by defendants Hill and Badik regarding funding were, allegedly, in fact false. (Id. ¶ 18). According to the complaint, "during the second week of March 2018, defendant Harbison, acting as an agent for [the union defendants], told defendant Hill and/or the Film's other producers, that IATSE would not permit its members to work on the Film unless [plaintiff] was terminated as the Film's Executive Producer." (Compl. ¶ 19). In addition, according to the complaint, "Kelly Boudreaux, an agent or employee of [defendant IATSE Local 491], informed members of IATSE [that it was] forcing the producers to remove [plaintiff] as Executive Producer on the Film and instructed those members (and employees on the Film) not to return [plaintiff's] calls." (Id. ¶ 19).

"On March 13, 2018, [plaintiff] was terminated from his employment as Executive Producer of the Film." (Id. ¶ 20). According to the complaint, "[w]hen [plaintiff] asked why he was being terminated, [defendant Hill] admitted that the reason for the termination was that 'The unions won't work with us if you are on the film.'" (Id.). "When [plaintiff] complained that this was illegal," defendant Hill allegedly responded: "'We know but the Unions said we need to fire you or they won't make a deal with us and we can't make the film.'" (Id.). According to the complaint, defendants Harbinson and IATSE "had longstanding animus and hostility towards" plaintiff, dating to an incident in 2013 when plaintiff "did not take steps to secure a union crew" on another film. (Id. ¶ 21).

According to the complaint, following plaintiff's termination, defendant Wegner, "acting both for himself and as an agent of [defendant WTGP], initiated a campaign to defame [plaintiff] and impugn his business reputation." (Id. ¶ 24). "Defendant [Wegner] made false statements about [plaintiff] to third-parties, including: a. That [plaintiff] had been terminated for dereliction of duty;

6

b. That [plaintiff] had not engaged with IATSE; and c. That [plaintiff] had caused 'a million dollars in damages' to the venture." (Id.). Defendants WTGP and 16:14 allegedly "continue to owe unpaid wages to [plaintiff] for his services as Executive Producer, in an amount totaling $54,900." (Id. ¶ 25).

## COURT'S DISCUSSION

A.    Motion to Remand (DE 28)

1.    Standard of Review

In a case removed from state court, "[i]f at any time before final judgment it appears that the district court lacks subject matter jurisdiction, the case shall be remanded." 28 U.S.C. § 1447(c). "The burden of establishing federal jurisdiction is placed upon the party seeking removal." Mulcahey v. Columbia Organic Chemicals Co., 29 F.3d 148, 151 (4th Cir. 1994). "Because removal jurisdiction raises significant federalism concerns, [the court] must strictly construe removal jurisdiction." Id. "If federal jurisdiction is doubtful, a remand is necessary." Id.; see Palisades Collections LLC v. Shorts, 552 F.3d 327, 336 (4th Cir. 2008) (recognizing the court's "duty to construe removal jurisdiction strictly and resolve doubts in favor of remand").

2.    Analysis

Defendant WTGP bases removal on complete preemption, principles of which the court sets forth below, followed by application to the instant case.

"The presence or absence of federal-question jurisdiction is governed by the 'well-pleaded complaint rule,' which provides that federal jurisdiction exists only when a federal question is presented on the face of the plaintiff's properly pleaded complaint." Caterpillar Inc. v. Williams, 482 U.S. 386, 392 (1987) (quoting Gully v. First National Bank, 299 U.S. 109, 112–113 (1936)).

7

"The rule makes the plaintiff the master of the claim; he or she may avoid federal jurisdiction by exclusive reliance on state law." Id. "[A] case may not be removed to federal court on the basis of a federal defense, including the defense of pre-emption, even if the defense is anticipated in the plaintiff's complaint, and even if both parties concede that the federal defense is the only question truly at issue." Id. at 393.

"There does exist, however, an 'independent corollary' to the well-pleaded complaint rule, known as the 'complete pre-emption' doctrine." Id. (quoting Franchise Tax Board of Cal. v. Construction Laborers Vacation Trust for Southern Cal., 463 U.S. 1, 22 (1983)). "On occasion, the [United States Supreme] Court has concluded that the pre-emptive force of a statute is so 'extraordinary' that it 'converts an ordinary state common-law complaint into one stating a federal claim for purposes of the well-pleaded complaint rule.'" Id. (quoting Metropolitan Life Insurance Co. v. Taylor, 481 U.S. 58, 65 (1987)).

"The complete pre-emption corollary to the well-pleaded complaint rule is applied primarily in cases raising claims pre-empted by § 301 of the LMRA," id., which provides: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in" federal court. 29 U.S.C. § 185(a). "[T]he pre-emptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization.'" Franchise Tax Board, 463 U.S., at 23 (quoting 29 U.S.C. § 185(a)). "Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301." Id.

"Section 301 not only provides federal courts with jurisdiction over employment disputes

covered by collective bargaining agreements, but also directs federal courts to fashion a body of federal common law to resolve such disputes." McCormick v. AT & T Techs., Inc., 934 F.2d 531, 534 (4th Cir. 1991) (en banc). "Section 301 governs claims founded directly on rights created by collective-bargaining agreements, and also claims 'substantially dependent on analysis of a collective-bargaining agreement.'" Caterpillar, 482 U.S. at 394 (quoting Electrical Workers v. Hechler, 481 U.S. 851, 859, n. 3 (1987)). Complete preemption "occur[s] when resolution of a state claim 'is inextricably intertwined with consideration of the terms of the labor contract.'" Davis v. Bell Atl.-W. Virginia, Inc., 110 F.3d 245, 247–48 (4th Cir. 1997) (quoting Allis-Chalmers Corp. v. Lueck, 471 U.S. 202, 213 (1985)).

Nevertheless, "[c]laims bearing no relationship to a collective-bargaining agreement beyond the fact that they are asserted by an individual covered by such an agreement are simply not pre-empted by § 301." Caterpillar, 482 U.S. at 397 n. 10. "[I]f an employer wishes to dispute the continued legality or viability of a pre-existing individual employment contract because an employee has taken a position covered by a collective agreement, it may raise this question in state court." Id. at 397. "It is true that when a defense to a state claim is based on the terms of a collective-bargaining agreement, the state court will have to interpret that agreement to decide whether the state claim survives." Id. at 398. "But the presence of a federal question, even a § 301 question, in a defensive argument does not overcome the paramount policies embodied in the well-pleaded complaint rule—that the plaintiff is the master of the complaint, that a federal question must appear on the face of the complaint, and that the plaintiff may, by eschewing claims based on federal law, choose to have the cause heard in state court." Id. at 398-99.

Here, plaintiff's action is not completely preempted by the LMRA because plaintiff does not

9

claim a "violation of [a] contract[] between an employer and a labor organization." 29 U.S.C. § 185(a). None of plaintiff's claims are "founded directly on rights created by a collective-bargaining agreement[]," "substantially dependent on analysis of a collective-bargaining agreement," or are "inextricably intertwined with consideration of the terms of" a collective bargaining agreement. Caterpillar, 482 U.S. at 394; Allis-Chalmers, 471 U.S. at 213.

Plaintiff's claims rely, instead, upon an alleged contract for employment with defendants 16:14 and WTGP for plaintiff's services as "Executive Producer," and termination from the position of "Executive Producer." (Compl. ¶¶ 13, 15, 20, 25, 29). Plaintiff does not rely upon terms of a collective bargaining agreement or invoke rights that arise from a collective bargaining agreement. Plaintiff has chosen to limit his claims to the type of contract he alleges in the complaint, limited to relief sought for work performed solely in the capacity as "Executive Producer" of the film. (See id.). That choice limits the scope of plaintiff's claims and precludes application of the complete preemption doctrine in the instant case. Absent complete preemption, plaintiff's action premised upon state law must be remanded to state court. See Caterpillar, 482 U.S. at 399.

Defendant WTGP raises several arguments in support of its position that plaintiff's claims are preempted, all of which are unavailing. Defendant WTGP argues that a collective bargaining agreement ("CBA") between WTGP and the DGA "governed the working relationship of all directors, assistant directors, and unit production managers working with WTGP on its film," including plaintiff. (Notice of Removal (DE 1) ¶ 9 (citing Brunswick Decl. ¶ 3)). Plaintiff, however, does not assert claims based upon his work as a director, assistant director, or unit production manager, but rather solely asserts claims based upon his work as "Executive Producer." (Compl. ¶¶ 13, 15, 20, 25, 29). The fact that plaintiff may have worked in a position of unit

production manager, and that such position may have been covered by the CBA, while plaintiff was also covered by an alleged agreement for work as "Executive Producer,"[2] is "irrelevant to the removal question." Caterpillar, 482 U.S. at 398 n. 12. Defendants may wish to advance numerous limitations and defenses to these claims due to the terms of the CBA. But plaintiff's claims grounded solely in an Executive Producer position, and alleged agreement therefor, are what "the plaintiff has chosen to plead," and plaintiff "may, by eschewing claims based on federal law, choose to have the cause heard in state court." Caterpillar, 482 U.S. at 399 (emphasis in original).

In this manner, the Caterpillar case is informative, where the defendant's "basic error [was] its failure to recognize that a plaintiff covered by a collective-bargaining agreement is permitted to assert legal rights independent of that agreement, including state-law contract rights, so long as the contract relied upon is not a collective-bargaining agreement." 482 U.S. at 396. The same can be said here, where defendant WTGP seeks to transform plaintiff's claims arising out of an alleged separate employment agreement into ones arising out of a collective bargaining agreement.

Defendant WTGP argues that plaintiff's alleged role as "Executive Producer" is without any substance, and that plaintiff "was expected to receive a 'vanity' on-screen credit of 'Executive Producer' as a benefit of his position as the Unit Production Manager ('UPM')" of the film. (Resp. (DE 40) at 5; Badik Decl. (DE 42) ¶ 3). Defendant notes that many of the purported Executive Producer duties claimed by plaintiff fall within the UPM duties set forth in the CBA. (See Resp. (DE 40) at 20-21). This argument, however, goes squarely to the ultimate merits of plaintiff's claims and defendant's defenses, drawing inferences in the light most favorable to defendant. As

---

[2] Plaintiff disputes that his position as a unit production manager was even covered by the CBA, because defendant WTGP did not execute the CBA until after plaintiff was terminated. The court need not and should not resolve this dispute for purposes of complete preemption analysis. See Caterpillar, 482 U.S. at 398 n.13 ("We intimate no view on the merits of . . . questions that must be addressed in the first instance by the state court.").

such it "impermissibly attempts to create the prerequisites to removal by ignoring the set of facts (i.e., the individual employment contract[]) presented by [plaintiff], along with [its] legal characterization of those facts, and arguing that there are different facts [plaintiff] might have alleged that would have constituted a federal claim." Caterpillar, 482 U.S. at 396-97.

Defendant WTGP asserts that plaintiff drafted "numerous contemporaneous documents," which defendant contends "irrefutably demonstrate" his employment, termination, and all related claims are "inextricably intertwined with, and require the interpretation of," the CBA. (Resp. (DE 40) at 6). Defendant points out that the Film's budget, weekly time cards, salary worksheet, and deal memo, all state that plaintiff's total compensation for all services rendered was governed by the CBA. (Id. at 18). These arguments, however, again pertain to the merits of plaintiff's claims. If it is true that all documents and evidence pertaining to plaintiff's work requires all terms to be governed by the CBA, and leaves no room for any separate agreement regarding plaintiff's Executive Producer position, then defendant WTGP may prevail on the merits. But, these are not the facts alleged in the complaint. Plaintiff alleges expressly that a "valid contract existed between [plaintiff] and defendant [WTGP] pursuant to which [plaintiff] was employed by [WTGP] to serve as Executor Producer on the film." (Compl. ¶ 29). Plaintiff asserts that he agreed with WTGP that "his compensation as Executive Producer would reflect the value of the services rendered in the pre-funding stage" of the film. (Id. ¶ 13). Albeit potentially at his own peril on the merits, plaintiff is entitled to limit the source of his contractual and tort claims, thereby precluding federal jurisdiction over his claims. See, e.g., Harless v. CSX Hotels, Inc., 389 F.3d 444, 449 (4th Cir. 2004) (noting that plaintiff "emphatically represented that his claims were based solely on the West Virginia Human Rights Act and the West Virginia Workers' Compensation Act and that he had no intention of

referring to the CBA").

Defendant WTGP also points out that plaintiff lodged a grievance with the DGA, and reached a negotiated settlement with DGA, for unpaid wages. (Resp. (DE 40) at 19). Critically, however, "it is the legal character of a claim, as independent of rights under the collective-bargaining agreement, (and not whether a grievance arising from precisely the same set of facts could be pursued) that decides whether a state cause of action may go forward." Livadas v. Bradshaw, 512 U.S. 107, 123–24 (1994) (internal quotations omitted). Thus, the fact that plaintiff pursued a grievance concerning one aspect of his employment with defendant WTGP, does not transform plaintiff's state law claims into federal claims under the LMRA. In any event, where plaintiff alleges claims arising out of a separate employment agreement, the availability or pursuit of grievance procedures under the CBA is irrelevant. See Caterpillar, 482 U.S. at 399 n. 15 (noting employer's "argument presumes that [plaintiff's] claims are arbitrable, when, in fact, they are alleged to grow out of individual employment contracts to which the grievance-arbitration procedures in the collective-bargaining agreement have no application").

Defendant WTGP argues that this case is analogous to Barton v. House of Raeford Farms, Inc., 745 F.3d 95 (4th Cir. 2014), where the Fourth Circuit held a state law wage and hour claim preempted because it sought "to displace the CBA that established the terms and conditions of their employment and to replace it with what they understood to be [the employer's] individual agreements" with them. 745 F.3d at 109. Barton, however, is inapposite in several critical respects. First, it did not involve an issue of federal question jurisdiction arising from complete preemption, but rather preemption as a defense to a state law wage claim in a case arising under original jurisdiction of the Fair Labor Standards Act, 29 U.S.C. § 201. See 745 F.3d at 99. Accordingly, the

13

case did not involve the same standard of review requiring the court to "construe removal jurisdiction strictly and resolve doubts in favor of remand." Palisades Collections LLC, 552 F.3d at 336.

Second, Barton concerned employees who indisputably held a single position, as "production employees," for a chicken processor. 745 F.3d at 99. This is in contrast to the instant case, where plaintiff claims he held a position of Executive Producer that was subject of a contract for employment with defendant WTGP, which is separate from his role as "Unit Production Manager." (Compl. ¶¶ 13, 15, 20, 25, 29; Pl's Decl. (DE 29-1) ¶¶ 2-6, 10). Third, it was undisputed in Barton that the plaintiffs' wages "were governed by a collective bargaining agreement" between the employer and a union, and that all plaintiffs "were members of the bargaining unit covered by the CBA." 745 F.3d at 99, 100-101. Here, none of those facts are alleged in the complaint, and plaintiff disputes that he was hired into any position covered by the CBA, and that defendant WTGP was a signatory to the CBA at the time of plaintiff's employment. (Pl's Decl. (DE 29-1) ¶¶ 7-9).

Accordingly, Barton is inapposite where the case stands for the proposition that a contract claim "concern[ing] a job position governed by [a] collective bargaining agreement" is completely preempted. 745 F.3d at 109 (quoting Chmiel v. Beverly Wilshire Hotel Co., 873 F.2d 1283, 1286 (9th Cir.1989)) (emphasis added). More analogous and pertinent to the instant case is Caterpillar, in which plaintiffs claimed contract rights under a position "outside the coverage of the collective-bargaining agreement," and where disputed issues regarding the individual employment contracts and the employer-employee relationship precluded removal jurisdiction. 482 U.S. at 388 & 396.

Defendant WTGP also cites several other cases which it contends demonstrate preemption over plaintiff's claims for wrongful termination, unfair and deceptive trade practices, and

defamation. (See Resp. (DE 40) at 22-25 (citing Davis v. Bell Atl.-W. Virginia, Inc., 110 F.3d 245, 249 (4th Cir. 1997); Barbe v. Great Atl. & Pac. Tea Co., No. 89-1566, 1991 WL 136779 (4th Cir. July 26, 1991); Martin v. Watkins, No. 7:10-CV-00423, 2010 WL 5371341, at *1 (W.D. Va. Dec. 22, 2010)). These cases are all distinguishable where they presume coverage of a plaintiff's position by a collective bargaining agreement, see, e.g., Davis v. Bell Atl.-W. Virginia, Inc., 110 F.3d 245, 249 (4th Cir. 1997) (addressing contract and wrongful termination claims, stating without qualification that the employer's "collective-bargaining agreement remained in force to govern [the plaintiff's] employment relationship"); Barbe, 1991 WL 136779 * 1 (addressing defamation claims, stating "the employee[] was covered by a collective bargaining agreement"), or presume that a claim arises out of a grievance meeting arising under a collective bargaining agreement that "governs the relationship between [the employer's] management personnel and hourly production workers," Martin, 2010 WL 5371341 *1.

In sum, defendant WTGP has not demonstrated that any of plaintiff's claims are completely preempted by the LMRA. Therefore, the court lacks federal subject matter jurisdiction over plaintiff's claims, and the case must be remanded to state court.

  3. Attorney's Fees and Costs

Plaintiff requests attorney's fees and costs upon remand. "An order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." 28 U.S.C. § 1447(c).

> Absent unusual circumstances, courts may award attorney's fees under § 1447(c) only where the removing party lacked an objectively reasonable basis for seeking removal. Conversely, when an objectively reasonable basis exists, fees should be denied. In applying this rule, district courts retain discretion to consider whether unusual circumstances warrant a departure from the rule in a given case. For instance, a plaintiff's delay in seeking remand or failure to disclose facts necessary

15

to determine jurisdiction may affect the decision to award attorney's fees. When a court exercises its discretion in this manner, however, its reasons for departing from the general rule should be faithful to the purposes of awarding fees under § 1447(c).

Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005). Plaintiff has not demonstrated that he is entitled to costs and expenses, including attorney fees, under the circumstances of this case. Defendant WTGP did not lack an objectively reasonable basis for seeking removal. Its removal petition sets forth in detail grounds for removal and it has comprehensively briefed the issues arising from the removal, including with reference to a wide range of case law and documents in the record. The court declines in its discretion to award fees and costs. See In re Lowe, 102 F.3d 731, 733 n. 2 (4th Cir.1996) (rejecting request for attorney's fees where basis for remand is not "obvious").

B.    Remaining Motions

Lacking jurisdiction over this action, the court does not reach the remaining motions to dismiss claims and counterclaims, and to transfer venue. See Roach v. W. Virginia Reg'l Jail & Corr. Facility Auth., 74 F.3d 46, 49 (4th Cir. 1996). The court leaves these remaining motions for consideration by the state court in the first instance, including polling of the parties as to whether the motions may be decided as presented or re-filed in conjunction with further proceedings upon remand.

## CONCLUSION

Based on the foregoing, plaintiff's motion to remand (DE 28) is GRANTED. In accordance with 28 U.S.C. § 1447(c), this matter is REMANDED to the Superior Court of New Hanover County. The court leaves remaining motions to dismiss and to transfer venue (DE 32, 37, 43) for consideration by the state court in the first instance. The clerk is DIRECTED to close this case.

SO ORDERED, this the 6th day of August, 2019.

_____
LOUISE W. FLANAGAN
United States District Judge